## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

JASON BOLIN; RACHEL BOLIN,    }
    }
    Plaintiffs,    }
    }
    vs.    }    **CASE NO. 7:08-cv-01100-SLB**
    }
SUPERIOR WELL SERVICES INC.;    }
SUPERIOR GP, LLC; BRADFORD    }
RESOURCES LTD; GEOMET, INC,    }
    }
    Defendants.    }
    }
    }

## MEMORANDUM OPINION

This case is currently before the court on defendant GeoMet, Inc.'s ("GeoMet")

Motion for Summary Judgment, (doc. 129),[1] and Motion to Preclude Testimony of

Plaintiffs' Expert Herbert Cryar, (doc. 171).  Plaintiffs Jason Bolin ("Mr. Bolin") and

Rachel Bolin ("Mrs. Bolin")(collectively the "Bolins") filed their Third Amended and Re-

Stated Complaint (the "Complaint")  against defendants Superior Well Services Inc.

("Superior Inc."), Superior G.P., LLC ("Superior GP"), Bradford Resources LTD

("Bradford), GeoMet, and FMC Technologies, Inc. ("FMC Technologies"), alleging

causes of action for independent negligence against Superior and Superior GP, (doc. 115

at 4-7), common plan liability against Superior Inc. and Superior GP, (*id.* at 7-9),

---

[1] Reference to a document number, ["Doc. ___"], refers to the number assigned to each
document as it is filed in the court's record.

negligence against GeoMet, (*id.* at 9-10), negligence against Bradford, (*id.* at 10-11, 12), breach of warranty against Bradford, (*id.* at 13-15), AEMLD and negligence against FMC Technologies, (*id.* at 15-16), and loss of consortium against all defendants.  (*Id.* at 16.) Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that GeoMet's Motion for Summary Judgment, (doc. 129), and Motion to Preclude Testimony of Plaintiffs' Expert Herbert Cryar, (doc. 171) are due to be denied.

## I. <u>SUMMARY JUDGMENT STANDARD</u>

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of showing no genuine issue of material fact and that it is entitled to judgment as a matter of law.  *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and show that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986).   A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh

2

the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249.  Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and, therefore, evidence favoring the non-moving party is to be believed and all justifiable inferences are to be drawn in its favor.  *See id.* at 255.  Nevertheless, the non-moving party "need not be given the benefit of every inference but only of every *reasonable* inference."  *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999) (citing *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988)) (emphasis added).

## II.  FACTUAL AND PROCEDURAL HISTORY

In finding the facts, the court considered GeoMet's Motion for Summary Judgment, (docs. 129, 130 & 153), Plaintiffs' Opposition to GeoMet's Motion for Summary Judgment, (doc. 139), and the record evidence submitted by GeoMet and the Bolins. (Doc. 130, Exs. A-S; docs. 140-1 & 140-2; docs. 141-1 & 141-2; doc. 142-1; docs. 143-1 & 143-2; docs. 144-1 & 144-2; docs. 145-1 & 145-2; docs. 146-1 & 146-2; doc. 147-1; docs. 148-1, 148-2, 148-3, & 148-4; doc. 149-1; doc. 150.)  Although conflicting factual evidence is set forth herein, the court has ultimately construed the facts in the light most favorable to the Bolins, the non-movants.  *See Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990); *Zaben v. Air Products & Chemicals, Inc.*, 129 F.3d 1453, 1455 (11th Cir. 1997).[2]

---

[2] As noted in the Bolins' Opposition to GeoMet's Motion for Summary Judgment, (doc. 139), GeoMet did not comply with the court's instructions to list in separately numbered

## A. THE ACCIDENT

This case arises out of an accident that occurred on November 16, 2006, in which Mr. Bolin sustained severe physical injuries in the line and scope of his employment that resulted in the amputation of his right leg, severed arteries, loss of skin, and numerous other fractures and injuries.  (Doc. 115.)  On November 16, 2006, Mr. Bolin was an

---

paragraphs each material fact it contends is true and not in genuine dispute.  (*See* doc. 116 at Ex. A.)  Exhibit A to the Scheduling Order provides:

> The parties' submissions in support of and opposition to summary judgment motions must consist of: (1) a brief containing, in separately identified sections, (i) a statement of allegedly undisputed relevant material facts and (ii) a discussion of relevant legal authorities; and (2) copies of any evidentiary materials upon which the party relies. More detailed requirements for these submissions are explained in the following sections.

> **D. Manner of Stating Facts**

> All briefs submitted either in support of or opposition to a motion must begin with a statement of allegedly undisputed relevant material facts set out in *separately numbered paragraphs*. Counsel must state facts in clear, unambiguous, simple, declarative sentences. All statements of fact must be supported by specific reference to evidentiary submissions.

> **1. Moving Party's Initial Statement of Facts**

> The moving party shall list in *separately numbered paragraphs* each material fact the movant contends is true and not in genuine dispute, and upon which the moving party relies to demonstrate that it is entitled to summary judgment. Each such statement must be followed by a specific reference to those portions of the evidentiary record that the movant claims supports it.

(Doc. 116 at Ex. A.)  Although GeoMet did not list its undisputed facts in "separately numbered paragraphs," the Bolins categorized GeoMet's statements of undisputed fact by reference to the page and line of GeoMet's Memorandum Brief in Support of Motion for Summary Judgment.  (Doc. 130.)  The court notes that the format of GeoMet's brief had no inference on the court's decision regarding summary judgment.

4

employee of Superior Well Services Ltd. ("Superior Ltd."),[3] and was working at a methane gas well site in Bibb County, Alabama (the "RGGS 19-02-221 site"). (Doc. 115 ¶¶ 1-9; doc. 130, Ex. L at 205-06; doc. 139 at 3-4; doc. 148-3.) Mr. Bolin was part of a Superior Ltd. team that was performing a fluid based well stimulation service known as "fracturing" or "fracking." (Doc. 115 ¶ 7; doc. 130 at 1-2.) Fracturing is designed to break up rock underneath the ground to improve the flow of oil and natural gas from producing zones. (Doc. 115 ¶ 7; doc 130 at 1-2.) The procedure involves pumping a fluid mixture through a series of pumps and pipes at high pressures to create a fracture in the well formation that becomes a pathway for hydrocarbons to flow into the wellbore and increase the bore's productivity.[4] (Doc. 115 ¶ 7; doc. 130 at 1-2.)

On the day of the accident, Mr. Bolin was a "ground supervisor" and "senior guy" for the Superior Ltd. team that was laying out the iron and the pipe at the RGGS 19-02-221 site. (Doc. 140-2 at 162 & 199.) Also present at the RGGS 19-02-221 site on the day of the accident was GeoMet representative Lunar Mitchell ("Mr. Mitchell"). Though Mr. Mitchell was present at the RGGS 19-02-221 site, he was not in communication with

---

[3] In 1997, Superior Ltd. and Bradford were formed to engage in the well service business. Superior Inc. was formed in 2005 to act as a holding company for Superior Ltd and Bradford. In 2005, Superior Inc. became the limited partner in Superior Ltd. and Bradford. Superior G.P. was formed around the same time to act as the general partner of both Superior Ltd. and Bradford. Superior Inc. is the only member of Superior G.P. (Doc. 115 at 4.) Superior Ltd. was terminated from this action on October 23, 2009. (*See* docs. 63 & 65.)

[4] A similar fracking operation is described in *Tyler v. Dowell, Inc.*, 274 F.2d 890, 893 (10th Cir. 1960).

5

the Superior Ltd. team at the time of the accident.  (Doc. 130, Ex. C at 350-351 & ex. I at 100-01.)  The Superior Ltd. team coordinated their work using headsets and two way radios, and Mr. Mitchell remained in the "frac van," without a headset, during the priming process.  (Doc. 130, Ex. H at 236 & ex. I at 100-01.)

Mr. Mitchell and GeoMet did not give Mr. Bolin "any input into how the iron was laid out" at the RGGS 19-02-221 site.  (Doc. 130, Ex. C at 350-51 & ex. D at 354.)  Josh Mosley ("Mr. Mosely"), an onsite employee of Well Services Alabama, acknowledged that GeoMet would not "necessarily [be] in . . . [the] back pocket" of Mr. Bolin telling him how to perform the fracking operation.  (Doc. 130, Ex. O at 98-99.)  Also, Brett Camp ("Mr. Camp"), GeoMet's corporate representative, testified that GeoMet would "never" tell the service company "how to hook up their piping or anything like that." (Doc. 130, Ex. P at 41.)

On the other hand, Jarrod Franks ("Mr. Franks"), a Superior Inc. management employee, testified that GeoMet dictated "the amount of proppant [or sand]" to be pumped into the well, "what sort of sand" Superior Ltd. was to use, "the maximum pressure" used to pump the material down the well, "where they want the perforations to be in the casing," and the "barrels per minute" pump rate at which the fluid was to reach the well.  (Doc. 145-2 at 34-42.)  There is also evidence that GeoMet supplied some of the equipment in use at the RGGS 19-02-221 site.  (Doc. 146-2 at 77-81.)  Furthermore, Greg Weathers ("Mr. Weathers"), Superior's Inc.'s Fracking Manager, testified that

6

GeoMet designated "the pressure that they wanted the operation to be done at," "the size of the sand," "the chemicals they wanted used," and "the amount of material they wanted to be pumped down the hole."  (Doc. 146-1 at 43-44.)  Mr. Weathers could not think of "any aspect of the fracking operation" where Superior Ltd. or Superior Inc. would not do what GeoMet desired.  (*Id.* at 43-44.)  Moreover, Mr. Mosely testified that GeoMet would contact him and tell him "the type of shape charges they want, how many shots per foot they want . . . and then they contact the frac company."  (Doc. 145-1 at 23-24.)  GeoMet then tells the frac company "what sort of sand and gel and that sort of thing they want shot down the hole."  (*Id*. at 24-25.)  It was "always" Mr. Mosely's understanding that companies like GeoMet that are present on the job site have "full control."  (*Id.* at 69-70.)  Moreover, there is evidence that Mr. Mitchell not only attended Superior Ltd. safety meetings and made comments, (*see* doc. 141-2 at 60), but also retained the authority to make changes, or even stop performance, at the RGGS 19-02-221 site if he, as a GeoMet supervisor, was not satisfied with the performance of Superior Ltd. employees regarding safety, layout, or pumping issues.  (*Id.* at 57-59; doc. 146-2 at 51-53.)

After laying out the iron and the pipe at the RGGS 19-02-221 site, Mr. Bolin was charged with letting the truck operators know when to begin readying the pumps and pumping fluid into the well.  (Doc. 140-2 at 227.)  There were four trucks present at the RGGS 19-02-221 site.  (*Id.* at 227 & 230-31.)  Mr. Bolin first instructed the trucks to prime the pumps and get ready to test.  (*Id.* at 226 & 230-31.)  Mr. Bolin then called for

7

the trucks "to shut down from priming up and getting ready to test." (*Id.* at 226.) Next, Mr. Bolin closed the bleed off valve. (*Id.*) After Mr. Bolin closed the bleed off valve, "excess pressure" from an unknown source caused the treatment iron to "burst in just a handful of seconds." (*Id.* at 228-29.) The second that Mr. Bolin closed the bleed off valve and "was turning away from it," Mr. Bolin heard a "tremendously loud whooshing noise" and "felt a curtain of darkness" fall over his eyes. (*Id.* at 226.) The next thing Mr. Bolin remembers is waking up underwater. (*Id.* at 226-27.)

The precise circumstances that led to the over-pressurization and caused Mr. Bolin's injuries are unclear. The parties have argued that two possible scenarios could have led to the over-pressurization. The first possibility is that Mr. Bolin "made a mistake," got the process "messed up," and "charged against closed valves or partially closed valves." (Doc. 141-1 at 370.) There is evidence from Carl Tate ("Mr. Tate"), a Superior Ltd. employee and supervisor, that Mr. Bolin "shouldn't have been in the danger zone at the time of the accident." (Doc. 130, Ex. S at 98-99.) On the other hand, there is evidence from John Srock ("Mr. Srock"), a Superior Inc. corporate representative, that if the accident happened the way Mr. Bolin said it did, then Mr. Bolin "would have [had] to stand" in the danger zone. (Doc. 143-1 at 129.) The second possibility is that "there was an inadvertent pressure release from one of the trucks through some malfunction of the componetry of the truck . . . ." (Doc. 141-1 at 371.) The truck driven by Charles Magee ("Mr. Magee"), a Superior Ltd. employee, had difficulties priming up and "had lost fluid

prime before." (Doc. 140-2 at 228; doc. 141-1 at 272-75; doc. 148-2; doc. 149-1 at 75.)

The truck driven by Mr. Magee was an "older model" pumping unit from Mississippi.

(Doc. 140-2 at 231-32; doc. 149-1 at 45-48.) As a result, Mr. Bolin "designated [Mr.

Magee's] truck to be the last and final truck that . . . [he] would bring on, to make sure

that his had the right amount of fluid going through his pump." (Doc. 140-2 at 228 &

235; doc. 141-1 at 272-76). During the priming process, Mr. Magee's truck "came up"

improperly. (Doc. 148-2.) Mr. Tate "had got onto Charles . . . on [the] last job for doing

that . . . ." (*Id.*) Mr. Tate told Mr. Magee "we do not come up like that to prime up." (*Id.*)

According to the affidavit of Herbert B. Cryar, Jr. ("Mr. Cryar")(the "Cryar

Affidavit"), (doc. 148-4), the Bolins' Well Services Expert, "[b]ecause over

pressurization [during a fracking operation] may occur inadvertently though mechanical

failure or human error and without warning, it is imperative that the layout include safety

features such as pressure relief valves . . . ." (Doc. 184-4 ¶ 8.) The pumping system that

was in place at the RGGS 19-02-221 did not incorporate a "pop-off valve," also known as

a "tattletale," or a more substantive high pressure relief valve, also known as a "dump

valve." (Doc. 140-2 at 202 & 206-07; doc. 141-1 at 364-68.) A pop-off valve is used to

monitor pressure. (Doc. 140-2 at 174-75; doc. 141-1 at 364-68.) A pop-off valve is

preset to a certain pressure, and if the pressure exceeds the preset rating, a "jet of water

will come out . . . ." (Doc. 140-2 at 174-75; doc. 141-1 at 364-68.) A pop-off valve does

not "necessarily release pressure," it just indicates that the pressure is starting to exceed

the preset pressure rating.  (Doc. 140-2 at 174-75; doc. 141-1 at 364-68.)   Compared to a

pop-off valve, a high pressure relief valve "is a much larger affair" that releases "more

pressure more quickly."[5]  (Doc. 140-2 at 194 & 202.)

Whether it would be Superior Ltd.'s decision as the contractor or GeoMet's

decision as the customer to employ a pop-off valve is disputed.  There is evidence from

Mr. Mitchell that GeoMet and Mr. Mitchell did not provide Superior Ltd. or Mr. Bolin

any instructions on whether a high pressure relief valve was needed.  (Doc. 130, Ex. R at

45-46.)  Mr. Camp also testified that, based on his discussions with GeoMet's frac

supervisor at Cahaba, Greg Cleary, and GeoMet's frac supervisor in West Virginia and

Virginia, Ryan Carter, that a pressure relief valve "was something that was mandatory to

the service company [Superior Inc.] to protect their employees."  (Doc. 146-2 at 55-56.)

There is evidence, however, that whether a pop-off valve would be used was a decision

left to GeoMet.  Mr. Franks testified that pop-off valves are "requested by the customer

[GeoMet] for protection of their casing."  (Doc. 145-2 at 40-41.)  Similarly, Mr. Srock

testified that "the use of pop-off valves is a determination primarily if the customer would

---

[5] The parties' briefs do not define the terms "pop-off valve" and "high pressure relief valve."  (*See* docs. 130, 139, & 153.)  Nor do the briefs explain the difference between the two or their significance.  (*See* docs. 130, 139, & 153.)   Although the Cryar Affidavit defines pressure relief valves as "safety devices designed to offer emergency pressure relief from a system at pre-set pressures," it does not distinguish between a pop-off valve and a substantive pressure relief valve.  (*Id.* ¶ 7.)  As a result, the court proceeds herein under the premise that a pop-off valve is a warning valve that releases only minimal pressure and a high pressure relief valve is a sustaining valve that relieves significant pressure.  (*See* doc. 115 at 9-10; doc. 140-2 at 174-75, 202, & 206-07; doc. 141-1 at 364-68.)

require it to protect his or her casing." (Doc. 143-1 at 40 & 44.) The Cryar Affidavit also indicates that "under the custom and practice in the oil well industry in 2006" it was GeoMet's responsibility "to mitigate the risks to persons and property working" at the RGGS 19-02-221 site, (doc. 148-4 ¶¶ 9-13), and that GeoMet "failed . . . to mitigate risks by failing to . . . [r]equire that Superior install and use a properly sized in-line pressure relief valve into the system during all operations . . . ." (*Id.* ¶ 13.)

Before the accident, Mr. Bolin and another Superior Ltd. employee, Ron Craft ("Mr. Craft"), complained to their Superior Ltd. supervisor about various safety issues and requested numerous pieces of equipment, including the presence of a pop-off valve and more substantive high pressure relief valve. (Doc. 140-2 at 193-96 & 203-05; doc. 141-1 at 372-373.) These requests were not honored.[6] (Doc. 140-2 at 192-96 & 203-05; doc. 141-1 at 372-373.) As a result, Mr. Bolin and the Superior Ltd. team proceeded with the fracking process using the equipment available to them. (Doc. 141-1 at 373-74.) Mr. Bolin knew he was proceeding in the absence of a pop-off valve and a high pressure relief valve and that doing so was "less safe" and a "calculated risk." (Doc. 140-2 at 206-09.) Mr. Bolin, however, "did nothing different" on the day of the accident "than any other day." (Doc. 148-2.) Mr. Bolin did not believe it was "practical" to stop the job just because the operation did not have something he wanted on it. (Doc. 141-1 at 373-74.) He believed it was "more practical to try to do the best you can with what you've got."

---

[6] This evidence does not implicate GeoMet.

11

(*Id.* at 374.)  When all of the equipment that was in use at the operation worked properly and the operators followed the correct signals, Mr. Bolin did not anticipate "a severe over pressurization that will actually blow the iron up."  (*See* doc. 141-1 at 369-70.)  Indeed, on the particular morning of the accident, Mr. Bolin did not anticipate "at that very minute" that he was "fixing to have a serious over pressurization."  (*Id.*)

**B. THE GEOMET-SUPERIOR INC. MASTER SERVICE AGREEMENT**

Superior Ltd. performed the fracking operations at the RGGS 19-02-221 site pursuant to an agreement executed by and between Superior Inc. and GeoMet (the "Master Service Agreement").  (*See* doc. 130 at Ex. N.)  GeoMet relies on the terms of the Master Service Agreement to prove that GeoMet  "did not retain or reserve the right to control the manner in which Superior Well Services performed work pursuant to the Master Service Agreement,"  (*id.* at 11), and "had no duty to supervise Superior's work in regard to safety issues."  (*Id.* at 13.)  The Master Service Agreement, in relevant part, provides:

> INDEPENDENT CONTRACTOR - Contractor [Superior] is an independent contractor and Company [GeoMet] shall have no power or authority to direct, supervise or control contractor in the performance of the work hereunder, Contractor being responsible to Company solely for results obtained.
> . . .
>
> COMPLIANCE WITH LAWS AND MINIMUM SAFETY STANDARDS - By acceptance of this Agreement, Contractor certifies that it will comply with all applicable laws and regulations and minimum safety standards . . . .

*Id.*, Ex. N at 1.)

## C. THE U.S. STEEL-GEOMET LEASE

The RGGS 19-02-221 site is owned by U.S. Steel and was leased to GeoMet pursuant to a lease agreement executed by and between GeoMet and U.S. Steel (the "U.S. Steel-GeoMet Lease") on April 9, 2002.  (*See* doc. 147-1.)  In the oil and gas industry, as the lessee under the U.S. Steel-GeoMet Lease, GeoMet is referred to as the "working interest" holder.  (Doc. 146-2 at 30-31.)  Having the working interest "involve[s] having control over the operations that are necessary to produce gas out of those wells."  (*Id* at 31.)  Mr. Camp executed an affidavit on June 6, 2006 to the State Oil and Gas Board of Alabama stating that "GeoMet, Inc. owns or has control of one-hundred percent of the rights to drill and produce with respect to the oil and/or gas in and under lands" at the RGGS 19-02-221 site.  (Doc. 148-3.)  Under the U.S. Steel-GeoMet Lease, GeoMet agreed to abide by "any" state and federal regulations, including environmental regulations and Occupational Safety and Health Administration ("OSHA") regulations.  (Doc. 146-2 at 33; doc.147-1.)

## D. GEOMET'S ALLEGED MISCONDUCT

Following the accident, Mr. Bolin filed the Complaint in this action and asserted a negligence cause of action against GeoMet.  (*See* doc. 115 ¶¶ 24-27.)  Count Three of the Complaint, which concerns the misconduct of GeoMet, makes these allegations:

> 24. GeoMet had the right to control the means and methods of the fracturing work being performed by Superior, Ltd. on GeoMet sites, such as the one in Bibb County where Jason was injured. Indeed, on other occasions, representatives of GeoMet had directed Superior, Ltd. to terminate the

13

employment of a Superior, Ltd. employee and directed the Superior, Ltd. employees in how to perform Superior's work. Superior alleges and its corporate safety manager has testified that there was a custom and practice between Superior, Ltd. and GeoMet, whereby the decision to employ pressure relief valves in the Superior treatment iron was left to GeoMet.

25. The fluid delivery system, pumps and treatment iron in use at the time of the explosion were all defective because they were not equipped with an appropriate pressure relief /sustaining valve, warning valve and other safety features which should have been incorporated in the fluid delivery system. Had such devices been in use, the explosion would not have occurred.

26. GeoMet knew or should have known that the fluid delivery system did not contain an appropriate pressure relief/sustaining valves and other safety devices. GeoMet negligently or wantonly failed to require that safety devices be incorporated into the fluid delivery system in use.

27. As a proximate result of GeoMet's wrongful conduct, Jason Bolin suffered numerous injuries including the loss of his leg, tremendous pain and mental anguish, disfigurement, loss of income and a permanent loss of earning capacity.

(*Id*.)

In response to the allegations in Count Three of the Complaint, GeoMet filed its

Motion for Summary Judgment.  (*See* docs. 129 & 130.)  The Bolins filed an Opposition

to GeoMet's Motion for Summary Judgment.  (*See* doc. 139.)  GeoMet filed a Response

to Plaintiff's Opposition to Motion for Summary Judgment.  (*See* doc. 153.)  GeoMet then

filed a Motion to Preclude Testimony of Plaintiffs' Expert Herbert Cryar.  (*See* doc. 171.)

The Bolins filed an Opposition to Defendant GeoMet's Motion to Preclude Testimony of

Plaintiffs' Expert Witness Herbert Cryar.  (*See* doc. 174.)  GeoMet filed a Response to

Plaintiffs' Opposition to GeoMet's Motion to Preclude Testimony of Plaintiffs' Expert

14

Witness Herbert Cryar. (*See* doc. 175.)

Thereafter, the Bolins filed a Motion for Leave to Supplement Plaintiffs'

Opposition to GeoMet's Motion for Summary Judgment. (*See* doc. 177.) The court

granted the Motion for Leave to Supplement. (Doc. 181.) The Bolins filed a

Supplemental Opposition to GeoMet's Motion for Summary Judgment. (Doc. 186.) The

court held a hearing on these pending motions. Following the hearing, the court invited

the parties to submit additional briefs regarding whether bid specifications may be

considered as evidence of reserved control. Both parties submitted additional briefs. (*See*

docs.191 & 201.) These matters were thereafter deemed under submission.

## III. <u>DISCUSSION</u>

### A. **MOTION TO PRECLUDE TESTIMONY**, **(DOC. 171)**

In its Motion to Preclude**,** GeoMet asks the court "to enter an Order precluding the

testimony of Plaintiffs' purported expert, Herbert Cryar." (Doc. 171 at 1.) GeoMet

argues that the Bolins, by introducing evidence of industry custom and practice, seek to

"circumvent" the Master Service Agreement's characterization of Superior, Inc. as an

"independent contractor," (*id.* at 1-9), and that, under Alabama law, "the unambiguous

terms of a contract cannot be altered by evidence of industry standards." [7] (*Id.* at 2.) In

---

[7] GeoMet also argues, for the first time in reply, that Mr. Cryar is "unqualified to speak to the issues for which Plaintiffs have designated him." (Doc. 175 at 5.) The court declines to consider this argument because it was raised for the first time in reply. (*See id*); *see also, e.g., Fisher v. Ciba Specialty Chemicals Corp.,* 238 F.R.D. 273, 317 n. 89 (S.D. Ala. 2006) ("[T]his argument is not properly raised because plaintiffs submitted it for the first time in their reply brief.") (citation omitted); *Sweet v. Pfizer,* 232 F.R.D. 360, 364 n. 7 (C.D. Cal. 2005)("[T]he

response, the Bolins contend that "the trier of fact should hear all of the evidence concerning the 'character of the relationship,' including evidence *aliunde* any written agreement that denominates one party as an 'independent contractor' and states who has 'responsibility' or owes a duty."  (Doc. 174 at 6.)  The court agrees with the Bolins.

In *Semo Aviation, Inc. v. Southeastern Airways Corp.*, 360 So. 2d 936 (Ala. 1978), the Alabama Supreme Court explained that:

> In Alabama, agency is determined by the facts, and not by how the parties may characterize the relationship. If the facts establish the relationship of principal and agent, the intention of the parties is immaterial, and the character of the relationship is not affected by an agreement between the parties than an agency does not exist, or that some other relation does exist.

*Id.* at 940 (citations omitted).  The Alabama Supreme Court and Alabama Civil Court of Appeals have repeatedly relied on the fluid, fact-driven agency analysis articulated in *Semo Aviation, Inc.  See, e.g., Ragsdale v. Life Ins. Co. of North. Am.*, 632 So. 2d 465, 468 (Ala. 1994); *Nat'l Security Fire & Cas. Co. v. Bowen*, 447 So. 2d 133, 137-38 (Ala. 1983); *Curry v. Welborn Transport*, 678 So. 2d 158, 160-61 (Ala. Civ. App. 1996).

The Alabama Civil Court of Appeals decision in *Curry*, which rests on the *Semo Aviation, Inc.* analysis, is instructive.  In *Curry*, the plaintiffs, Curry and his wife Bessie, sued the defendant trucking company, Welborn Transport ("Welborn"), alleging

---

moving party in a motion cannot submit new information as part of its Reply.") (citations omitted); *Williams v. Saxon Mortg. Services, Inc.*, 2007 WL 2828752, at *5 (S.D. Ala. 2007)("The Court declines to consider these contentions because they are procedurally improper. A reply brief is not an appropriate time to float new legal theories of relief that could have been raised in prior briefing, but were not.").

16

negligence, wantonness, and nuisance causes of action. Curry was called by a wrecker company to assist cleaning up a road after a tractor-trailer that was carrying cargo for Welborn ran off the road and overturned. During the course of the clean up, Curry accidentally inhaled diesel fumes and allegedly became nauseated, fell, and injured his shoulder as a result.  678 So. 2d at 159-60.  Welborn relied on two written agreements to show that the driver of the tractor-trailer, Bryan Keith Rose, was an "independent contractor" rather than an "employee or agent" of Welborn.  The court stated:

> Welborn asserts that Bryan Rose was not its employee or agent, but that he was the employee of Bobby Joe and Gloria Rose, who, Welborn says, were independent contractors. In support of this assertion, Welborn points to a document entitled "Acknowledgement regarding worker's compensation coverage and employment taxes," which was signed by Bryan Rose and which stated that he was the employee of Gloria Rose and not of Welborn Transport. Welborn also offers a provision from the lease agreement for the tractor-trailer truck, which states that Bobby Joe and Gloria Rose were to "have the sole responsibility for hiring or supplying drivers who operate the Equipment."

> To rebut this evidence, the Currys offer a number of documents that purport to name Welborn as Bryan's employer, such as an application for employment, a pre-employment urinalysis consent agreement, employment eligibility verification, request for check of driving record, record and certificate of road test, etc. Furthermore, the bill of lading for the cargo that Bryan was transporting when the accident occurred name Welborn Transport as the carrier.

> We note that agency is to be determined from the facts, and not by how the parties characterize their relationship. *Ragsdale v. Life Ins. Co. of North America,* 632 So.2d 465, 468 (Ala.1994); *Butler v. Aetna Finance Co.,* 587 So.2d 308, 310-11 (Ala.1991). "If the facts establish the relationship of principal and agent, the intention of the parties is immaterial, and the character of the relationship is not affected by an agreement between the parties that an agency does not exist, or that some other relation does exist."

17

> *Ragsdale, supra,* at 468 (quoting *Semo Aviation, Inc. v. Southeastern*
> *Airways,* 360 So.2d 936, 940 (Ala.1978)). Based on the evidence contained
> in the record, we believe that there exists a genuine issue of material fact as
> to whether Bryan Rose was Welborn's agent, and we conclude that that
> issue should properly be resolved by the trier of fact.

*Id.* at 160-61.

It is clear from *Semo Aviation, Inc.* and its progeny, including *Curry*, that the

analysis of the relationship between GeoMet, Superior, Inc., and Mr. Bolin is not

confined to the four corners of the Master Service Agreement.  GeoMet concedes that

"[t]hese cases each outline the multiple ways in which the master maintained control over

the alleged independent contractor, leading the Court to conclude that the nature of the

relationship and not the wording of the agreement determined that the contractor was

'independent.'"  (Doc. 175 at 2.)  GeoMet argues, however, that the line of cases

following *Semo Aviation, Inc.* is "easily distinguishable" because the Bolins "cannot cite

evidence that GeoMet controlled the manner of the fracking work . . . ."  (*Id.* at 2.)

GeoMet thus tacitly recognizes that the fact-driven agency analysis applies, but argues

that the Bolins claims do not survive under that analysis because the Bolins have

presented insufficient evidence of control on the part of GeoMet.  As discussed in detail

*infra*, this is the same argument GeoMet makes in its Motion for Summary Judgment.

(*See* doc. 130.) GeoMet's Motion to Preclude, however, is not a motion for summary

judgment; it is an evidentiary motion, and the Cryar Affidavit is simply another piece of

evidence that may be properly considered by the trier of fact in determining whether

18

GeoMet controlled the manner of Superior Inc. or Superior Ltd.'s performance at the RGGS 19-02-221 site.  Therefore, GeoMet's Motion to Preclude Testimony of Plaintiffs' Expert Herbert Cryar, (doc. 171), is due to be denied without prejudice as to GeoMet's right to file a Motion in Limine to preclude Mr. Cryar's testimony at trial on the basis of his qualifications.

**B.  MOTION FOR SUMMARY JUDGMENT**, **(DOC. 129)**

As aforementioned, the Complaint asserts a cause of action for negligence against GeoMet.  (*See* doc. 115 ¶¶ 24-27.)  GeoMet contends that it is entitled to judgment as a matter of law on the negligence claim on the following grounds: (1) GeoMet "owed no duty of care to Plaintiff . . . as GeoMet did not retain or reserve the right to control the manner in which the work was being performed at the time of the accident[;]" (2) Mr. Bolin's "admitted appreciation of the dangers inherent in proceeding with his work in the absence of a high pressure relief valve constitute an assumption of the risk" as a matter of Alabama substantive law; and (3) Mr. Bolin's actions "constitute[] a departure from the care of a reasonably prudent person and establishes Plaintiff's contributory negligence as a matter of Alabama substantive law."  (Doc. 129 at 1-2.)

As set forth above, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *See Celotex Corp.*, 477 U.S. at 322.  Where

the burden of proof at trial is on the non-moving party, this standard can be met either by submitting affirmative evidence negating an essential element of the non-movant's claim, or by demonstrating that the non-moving party's evidence itself is insufficient to establish an essential element of his or her claim. *Id.* at 322; *see* Fed. R. Civ. P. 56(a) and (b).

## A. NEGLIGENCE

In order to prove negligence, a plaintiff must show that the defendant breached an existing duty, causing damage to the plaintiff.[8]  *See Martin v. Arnold,* 643 So. 2d 564, 567 (Ala. 1994)("To establish negligence, the plaintiff must prove: (1) a duty to a foreseeable plaintiff; (2) a breach of that duty; (3) proximate causation; and (4) damage or injury."). "It is settled that for one to maintain a negligence action the defendant must have been subject to a legal duty." *Thompson v. Mindis Metals, Inc.,* 692 So. 2d 805, 807 (Ala. 1997) (citation omitted).  "A legal duty arises either from the common law or from a statute." *Id.* (citation omitted).  Whether a duty arises in a particular case is typically a question of law.  *Garner v. Covington Cnty*, 624 So. 2d 1346, 1349-50 (Ala. 1993). However, when the facts upon which the existence of a duty depends are disputed, the question of whether a duty exists is appropriate for the trier of fact.  *See id.*; *see also*

---

[8] GeoMet argues that in order to withstand summary judgment on a negligence claim against GeoMet, the Bolins must prove "(1) the existence of a duty on the part of GeoMet; (2) GeoMet's breach of that duty; (3) the existence of a causal relationship between GeoMet's conduct and the Plaintiffs' injuries; and (4) resulting injuries to the Plaintiffs."  (Doc. 130 at 9-10.)  This argument misstates the applicable burden.  Although this will be the Bolins' burden at trial, on summary judgment the Bolins need only "set forth specific facts showing there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); *see also Celotex*, 477 U.S. at 324.

*Alabama Power Co. v. Brooks*, 479 So. 2d 1169, 1175 (Ala. 1985) (quoting *Alabama*

*Power Co. v. Alexander*, 370 So. 2d 252, 254 (Ala. 1979) ("Where the facts upon which

the existence of a duty depends, are disputed, the factual dispute is for resolution by the

jury.")).

The standard applied to determine whether GeoMet, the premises owner or

working interest holder, owed a duty to Mr. Bolin, an employee of Superior Ltd., is

settled.[9]  In *Weeks v. Alabama Electric Cooperative, Inc.*, 419 So. 2d 1381 (Ala. 1982),

the Alabama Supreme Court explained:

> [A] premises owner owes no duty of care to employees of an independent
> contractor with respect to working conditions arising during the progress of
> the work on the contract. "The general rule does not apply, however, if the
> premises owner retains or reserves the right to control the manner in which
> the independent contractor performs its work." *Thompson v. City of Bayou
> La Batre,* 399 So. 2d at 294; *Hughes v. Hughes,* 367 So. 2d at 1386. "When
> the right of control is reserved, the relationship changes from one of
> premises owner and independent contractor to that of master and servant."
> 399 So. 2d at 294.
>
> A master-servant relationship is *not* created, however, when the owner
> merely retains the right to supervise or inspect work of an independent

---

[9] GeoMet contends that because the Bolins "cannot establish under Alabama law that
GeoMet was the premises owner and, in fact, Plaintiff admits that U.S. Steel was the premises
owner, Plaintiff's argument that GeoMet owed a duty to Superior to provide a safe place to work
must fail."  (Doc. 153 at 23.)  GeoMet, however, has not directed the court to any authority to
establish that a working interest holder/lessee does not stand in the same shoes as the premises
owner.  The cases cited by GeoMet and the Bolins do not necessarily hinge on ownership.  In
*Thomas v. Pepper Southern Construction, Inc.*, 585 So. 2d 882 (Ala. 1991), cited by GeoMet, the
injured defendant, an employee of the subcontractor, brought suit against the general contractor
and the premises owner.  *See id.* at 883.  The court employed the same analysis for both the
premises owner and the general contractor.  *Id.* at 883-85.  This court applies that same analysis
in this case.

21

> contractor as it progresses for the purpose of determining whether it is
> completed according to plans and specifications, and retains the right to
> stop work that is not properly done. *Pate v. United States [sic] Steel Corp.*,
> 393 So. 2d at 995.

*Weeks*, 419 So. 2d at 1383; *see also Wright v. McKenzie*, 647 F. Supp. 2d 1293, 1300

(M.D. Ala. 2009) (citing *Keebler v. Glenwood Woodyard, Inc.*, 628 So. 2d 566, 568 (Ala.

1993)) ("Whether a relationship is an independent contractor relationship or an agency or

employment relationship depends on whether the entity for the whom the work is

performed *controls, or has reserved the right to control*, the means by which work is

done.") (emphasis added).

     In this case, the Master Service Agreement unambiguously provides that the scope

of authority and supervision to be exercised by GeoMet is limited to protecting GeoMet's

interest in seeing that the results contemplated by the Master Service Agreement are

achieved.  On that basis, GeoMet argues that because the Master Service Agreement

states "that GeoMet did not retain or reserve the right to control the manner in which

Superior was to perform its work[,] [. . .] GeoMet owed no duty of care to Superior or its

employees."  (Doc. 171 at 6-7.)  However, "merely saying it is so does not make it so."

*Anderson v. Celebrezze*, 460 U.S. 780, 816 (1983).  The Alabama Supreme Court has

repeatedly held that to determine whether an owner-independent contractor relationship is

converted to that of master-servant, courts must analyze "the written contract and the

actions of the parties pursuant to the contract."  *Pugh*, 512 So. 2d at 1318; *see also Tittle*

*v. Alabama Power Co.*, 570 So. 2d 601, 603 (Ala. 1990) ("[T]his Court's inquiry does not

end after examining the contract between the parties; their conduct must also be considered."); *Weeks*, 419 So. 2d at 1383 ("Any evidence tending to establish that AEC retained this control, either by contract or by its actions, will meet this burden of proof."). Thus, regardless of the terms of the Master Service Agreement, if GeoMet exercised control or retained the right to exercise control "over *the means and manner* in which the work . . . [was] performed," GeoMet may be liable for Mr. Bolin's injuries. *Tittle*, 570 So. 2d at 604.

As to the conduct of the parties, GeoMet has submitted evidence showing that it hires contractors such as Superior Inc. and Superior Ltd. and relies on their expertise in performing the job, (*see* doc. 130, Ex. O at 96-99; doc. 130, Ex. P at 41), that Mr. Bolin performed his actions on the RGGS 19-02-221 site on his own initiative and without instruction from GeoMet, (*see* doc. 153 at 8-22; doc. 130 at 2 & Ex. E at 358-59), and that Mr. Mitchell and GeoMet did not give Mr. Bolin any input regarding the layout of the iron or the fracking operation in general at the RGGS 19-02-221 site.  (Doc. 130, Ex. C at 350-51 & ex. D at 354.)  In response, however, the Bolins have presented sufficient evidence to raise a genuine issue of material fact as to GeoMet's actual control and reserved right of control at the RGGS 19-02-221 site.

First, the Bolins presented substantial evidence showing that GeoMet dictated the materials to be used in the fracking operation (i.e. the means) and controlled the manner in which those materials were implemented.  Mr. Franks testified that GeoMet dictated

"the amount of sand" to be pumped into the well, "what sort of sand" Superior Ltd. was to use, "the maximum pressure" used to pump the material down the well, "where they want the perforations to be in the casing," and the "barrels per minute" pump rate at which the fluid was to reach the well.  (Doc. 145-2 at 34-42.)  Mr. Weathers testified that GeoMet designated "the pressure that they wanted the operation to be done at," "the size of the sand," "the chemicals they want used," and "the amount of material they wanted to be pumped down the hole."  (Doc. 146-1 at 43-46.)  Mr. Weathers could not think of "any aspect of the fracking operation" where Superior Inc. or Superior Ltd. would not do what GeoMet desired.  (*Id.* at 43-44.)  The testimony of Mr. Franks and Mr. Weathers is corroborated by the testimony of Mr. Mosely.  Mr. Mosely testified that GeoMet would contact him and tell him "the type of shape charges they want, how many shots per foot they want . . . and then they contact the frac company."  (Doc. 145-1 at 23-24.)  According to Mr. Mosely, GeoMet then tells the frac company "what sort of sand and gel and that sort of thing they want shot down the hole."  (*Id*. at 24-25.)  It was "always" Mr. Mosely's understanding that companies like GeoMet that are present on the job site have "full control."  (*Id.* at 69-70.)

GeoMet contends that the testimony of Mr. Mosely, Mr. Franks, and Mr. Weathers "is misleading because Plaintiff is referring to the requirements set forth in GeoMet's solicitation of competitive bids."  (Doc. 153 at 2.)  GeoMet maintains that "[o]utlining the requirement to bid on a job cannot be equated to controlling the manner of work

performed by an independent contractor." (*Id.*)  As the Bolins correctly point out in their post-hearing brief, Mr. Camp clearly testified that there was no bid for the job at the RGGS 19-02-221 site and that no bid specifications sheet was created.  (Doc. 201 (citing doc. 130, Ex. P at 21-23).)  Thus, GeoMet's contention is without merit.

Even assuming the evidence of control outlined above arose from specifications set forth in a solicitation of bids for the fracking job at the RGGS 19-02-221 site, the court nonetheless finds that these requirements are substantive evidence of a right of control because these requirements actually translated to the RGGS 19-02-221 site.  In *Parr v. Champion Intern. Corp*, 667 So. 2d 36 (Ala. 1995), the Alabama Supreme Court described its previous decision in *Mead Coated Board, Inc. v. Dempsey*, 644 So. 2d 872 (1994):

> In *Mead,* . . . the injured party was a log-truck driver and an employee of an independent contractor that supplied logs to Mead Coated Board, Inc., at Mead's paper mill. The evidence showed that Mead's rules and regulations controlled the manner in which the independent contractors unloaded the logs on the Mead premises, including giving Mead employees the authority to refuse to admit or unload any truck that did not comply fully with Mead's requirements. Quoting from *Weeks v. Alabama Electric Cooperative, Inc.,* 419 So. 2d 1381 (Ala.1982), and *Thompson v. City of Bayou La Batre,* 399 So. 2d 292 (Ala.1981), the *Mead* Court held that when the premises owner reserves the right of control apparent in *Mead,* the relationship of owner-independent contractor changes to that of master-servant.

*Parr*, 667 So. 2d at 38.

As long as the performance requirements set forth in a bid specification are actually implemented and go directly to the means and manner of performance (which

they did here), this court sees no reason to treat those requirements any differently than the rules and regulations discussed in *Mead*.  To hold otherwise would allow entities such as GeoMet to avoid liability by cloaking a retained right of control otherwise sufficient to impose liability in a bid specification.  That is not a result contemplated by Alabama law. Thus, even assuming the requirements outlined above originated in a bid specification for the fracking job at the RGGS 19-02-221 site, the court treats such specifications as substantive evidence showing that GeoMet exercised control over the means and manner of Superior Inc. and Superior Ltd.'s performance.

Second, the Bolins presented evidence that a GeoMet employee was present at the RGGS 19-02-221 site and that the employee's presence went beyond mere supervision to ensure compliance.  Mr. Mitchell was present on the job site on a daily basis and at the time of the accident.  (Doc. 130, Ex. C at 350-351 & ex. I at 100-01.)  The evidence shows that Mr. Mitchell attended Superior Ltd. safety meetings and made comments at such meetings.  (Doc. 141-2 at 60.)  Mr. Mitchell testified that "he would just tell . . . [Superior at the safety meetings] to be careful, watch what they're doing."  (*Id.*)  The evidence also shows that Mr. Mitchell, like the Mead employees in *Mead*, retained the authority to make changes, or even stop performance, at the RGGS 19-02-221 site if he, as a GeoMet supervisor, was not satisfied that Superior Ltd. employees were in compliance with GeoMet's safety, iron layout, or pumping requirements.  (Doc. 141-2 at 57; doc. 146-2 at 51-53.)  More specifically, Mr. Mitchell testified as follows:

Q: Well, if you saw something that wasn't right, didn't you have the power to stop it and make them fix it?

A: If I saw them doing something that wasn't right, yes.

Q: If you saw something, the way the iron was put together, maybe a mismatch, or wrong size, or whatever and you noticed it, you would have the right to tell them to fix it, wouldn't you?

A: Sure.

Q: And if you saw that they didn't have whatever safety device, perhaps, they needed to have on the trucks, if you knew they didn't have it, you would have the right to get them to fix that, wouldn't you?

A: Sure.

Q: And if they did the job in such a fashion that the fracking was not going right, you weren't getting the chemical where you needed it to, you could get that taken care of?

A: Sure.

Q: If you saw that one of their employees, and we'll just take Superior just because they're the ones in this case, if you saw one of their employees being guilty of horseplay or something that you didn't think was proper, you could get them off the job, couldn't you?

A: Yes.

(Doc. 141-2 at 56-58.)

Mr. Mitchell's testimony regarding GeoMet's retained right of control is

corroborated by the testimony of Mr. Franks.  Mr. Franks testified that GeoMet, as the

customer, could change the makeup of the chemicals or adjust the amount and size of the

sand used in the fracking operation.  (Doc. 145-2 at 56-57.)  Mr. Franks also testified that

27

GeoMet, as the customer, dictated the maximum pressure that Superior Inc. or Superior Ltd. could use and that Mr. Mitchell had the authority to tell Superior Ltd. or Superior Inc. which of the two methods - add chemicals or slow the pump rate - should be used to lower the pressure.  (*Id.* at 59-62.)

Third, although GeoMet contends that it "had no duty to supervise Superior's work in regard to safety issues,"  (doc. 130 at 13), because Superior agreed, pursuant to the Master Service Agreement, to abide by "all applicable laws and regulations and minimum safety standards," (doc. 130, Ex. N at 3), the Bolins presented evidence showing that whether certain safety equipment would be used, namely a pop-off valve, was a decision left to GeoMet.  Mr. Franks testified that pop-off valves are "requested by the customer [GeoMet] for protection of their casing." (Doc. 145, Ex. F at 40-41.)  Mr. Srock testified that "the use of pop-off valves is a determination primarily if the customer would require it to protect his or her casing."  (Doc. 143-1 at 40 & 44.)

Finally, the Bolins submitted evidence showing that GeoMet supplied some of the equipment in use at the RGGS 19-02-221 site, (doc. 146-2 at 77-81), which supports the finding of a master-servant relationship.  *See Williams v. Tenn. River Pulp and Paper Co.*, 442 So. 2d 20, 22 (Ala. 1983) (considering the identity of the person or entity that furnished or supplied the equipment as a factor in determining whether an independent contractor or master-servant relationship exists) (citing *Restatement (Second) of Agency*, § 220(2)(e) (1957)); *Wright*, 647 F. Supp. 2d 1293 at 1301 (same).  Mr. Camp testified that

the "frac tanks" (and the water in the tanks) that were used by Superior Ltd. during the fracking operation were rented and supplied by GeoMet.  (*Id.* at 77-78.)  Mr. Camp also testified that the "frac valve that is put on the well head" and that Superior Ltd. would use to "hook up their iron to" was rented and supplied by GeoMet. (*Id.* at 80-81.)

Despite the evidence of actual and retained control submitted by the Bolins, GeoMet relies heavily on *Pugh v. Butler Telephone Co.* and asserts that *Pugh* "is directly on point to the issues present in this matter."  (Doc. 130 at 13.)  In *Pugh*, the plaintiff was killed in the line and scope of his employment when the sides of an excavated area collapsed.  The excavation was dug on the day of the accident, but without knowledge of the defendant Butler Telephone Company ("Butler") or the defendant Sandidge Construction Company ("Sandidge").  Sandidge, the plaintiff's employer, had a contract with the telephone company to lay underground cable.  Sandidge's responsibility was to "ensure the expeditious and economical construction of the project with approved plans and specifications."  512 So. 2d at 1318.

Although the factual scenario and legal issue in *Pugh* are similar to those in this case, the nature of the record and the evidentiary showing made by the non-movant are not.  In *Pugh*, the court was looking for a "scintilla of evidence to support a finding that Sandidge was an agent of Butler . . . ."  *Id.*  After reviewing the record, the *Pugh* court stated:

> There is *no evidence in the record* that Butler exercised any right of control over the manner in which Sandidge performed any of its work the project.

> The undisputed evidence in the record shows that Sandidge's employees
> took their directions in the laying of the pipe or cable exclusively from
> Sandidge and that Sandidge alone was 'running the show and controlling
> the work place.

*Id.* at 1319 (emphasis added).

Unlike the non-movant in *Pugh*, the Bolins have pointed to specific facts in the record to raise a genuine issue of material fact regarding GeoMet's reserved right of control over the means and manner of Superior Inc. and Superior Ltd.'s performance. While the Master Service Agreement, like the contract at issue in *Pugh*, purports to limit GeoMet's retained right of control and duty to provide a safe work environment, the analysis applied in agency cases such as *Pugh,* as discussed *supra*, is not limited to the applicable written agreements.  And here, from the collective evidence of control presented by the Bolins, which rises to a level far beyond that in *Pugh*, the court concludes that whether GeoMet retained the right to control the method and manner of Superior Ltd. and Superior Inc.'s performance is a question best left for the trier of fact. *See Wright*, 647 F. Supp. 2d at 1302 ("Alabama courts have repeatedly acknowledged that agency matters are fact intensive findings, and, have noted that it is rarely appropriate to decide such questions at the summary judgment stage.") (citation omitted).  GeoMet's Motion for Summary Judgment on the Bolins' negligence claim is thus due to be denied.

## B. CONTRIBUTORY NEGLIGENCE

"A plaintiff cannot recover in a negligence action where the plaintiff's own negligence is shown to have proximately contributed to his damage, notwithstanding a

showing of negligence on the part of the defendant." *Hannah v. Gregg, Bland & Berry, Inc.,* 840 So. 2d 839, 860 (Ala. 2002) (citing *Watters v. Bucyrus-Erie Co.,* 537 So. 2d 24 (Ala. 1989); *Brown v. Piggly-Wiggly Stores,* 454 So. 2d 1370, 1372 (Ala. 1984)). "The question of contributory negligence is normally one for the jury.  However, where the facts are such that all reasonable persons must reach the same conclusion, contributory negligence may be found as a matter of law." *Hannah,* 840 So. 2d at 860 (citations omitted).

The evidentiary showing required to obtain summary judgment on the basis of Mr. Bolin's contributory negligence is "very demanding." *Tell v. Terex Corp.*, 962 So. 2d 174, 180 (Ala. 2007).  In *Tell,* the Alabama Supreme Court reiterated the following principles concerning the application of contributory negligence at the summary judgment stage of an action:

> To establish contributory negligence as a matter of law, a defendant seeking a summary judgment must show that the plaintiff put himself in danger's way and that the plaintiff had a conscious appreciation of the danger *at the moment the incident occurred*. The proof required for establishing contributory negligence as a matter of law should be distinguished from an instruction given to a jury when determining whether a plaintiff has been guilty of contributory negligence. A jury determining whether a plaintiff has been guilty of contributory negligence must decide only whether the plaintiff failed to exercise reasonable care. *We protect against the inappropriate use of a summary judgment to establish contributory negligence as a matter of law by requiring the defendant on such a motion to establish by undisputed evidence a plaintiff's conscious appreciation of danger*.

*Tell*, 962 So. 2d at 177 (quoting *Hannah*, 840 So. 2d at 860-61) (emphasis added).

31

GeoMet's contributory negligence argument is two-fold.  First, GeoMet argues that Mr. Bolin was contributorily negligent because he consciously appreciated the dangers associated with proceeding with the priming procedure without a pop-off valve or high pressure relief valve.  (*See* doc. 130 at 20-21 & 25-26; doc. 153 at 25.)  Second, GeoMet argues that Mr. Bolin was contributorily negligent because he consciously appreciated the danger associated with closing the bleed off valve during the priming procedure and continuing to pump against closed valves.  (*See* Doc. 130 at 20-21 & 25-26.)

In support of its first argument, GeoMet relies almost exclusively on the testimony of Mr. Bolin.  GeoMet relies on the fact that Mr. Bolin had knowledge before the accident of the possibility that a pipe may rupture and accidentally discharge without the proper safety features, (*see* doc. 130, Ex. L at 210), as well as the fact that Mr. Bolin proceeded with the pump priming procedure knowing that he did not have pop-off valve or a high pressure relief valve installed on the system at the RGGS 19-02-221 site.  (*See id.* at  206-07).  GeoMet also relies on Mr. Bolin's admission that proceeding with the pump priming procedure in the absence of a pop-off valve or high pressure relief valve was "less safe," (*id.* at 207), and a "calculated risk."  (*Id.* at 208-09.)

The Bolins counter by arguing that Mr. Bolin had "safely performed many fracking operations before with the same iron layout when there was no over pressurization."  (Doc. 139 at 5.)  There is evidence that Mr. Bolin "did nothing different"

on the day of the accident "than any other day." (Doc. 148-2.) When all of the equipment that was in use at the operation worked properly and the operators followed the correct signals, Mr. Bolin did not anticipate "a severe over pressurization that will actually blow the iron up." (*See* doc. 141-1 at 369-70.) On the particular morning of the accident, Mr. Bolin did not anticipate "at that very minute" that he was "fixing to have a serious over pressurization." (*Id.*)

As to GeoMet's first argument, the court is not convinced by undisputed facts that a reasonable person in Mr. Bolin's position would consciously appreciate the danger of proceeding without pop-off valves or high pressure relief valves under the circumstances. GeoMet relies on a series of cases, namely *Buchanan v. Mitchell*, 741 So. 2d 1055 (Ala. 1999), *Harvell v. Johnson*, 598 So. 2d 881 (Ala. 1992), and *Owens v. National Sec. of Alabama, Inc.*, 454 So. 2d 1387 (Ala. 1984), to show that summary judgment is appropriate here. The holding, however, in each of those cases was premised on the undisputed nature of the evidence and inferences before the court. The evidence and inferences are mixed in this case, and the court finds that there is a genuine issue of material fact as to whether a reasonable person would consciously appreciate the danger of priming up the pumps without a pop-off valve or high pressure relief valve.

The question is not, as GeoMet implies, whether the safer or safest method was used or whether some risk was involved in the operation. Instead, the question is "whether the ordinary care of a reasonably prudent man was used under the then existing

circumstances." *Larson v. Tri-City Electric Service Co.*, 132 F.2d 693, 697-698 (7th Cir.

1943). "To require the safest method is to require the greatest care, whereas what is

required is the ordinary care of a reasonable prudent man." *Id.* As recognized by the

Seventh Circuit in *Larson*:

> If, in the performance of his duties, two or more methods are open to him,
> and he has no instructions to pursue one in particular, he necessarily must
> choose between them; and he cannot be said to have been negligent, if he,
> in good faith, adopts that which is more hazardous than another, provided
> the one pursued be one which reasonable and prudent persons would adopt
> under like circumstances. Any other rule would require the servant to be
> measured by the standard of every prudent person; for only extremely
> cautious persons adopt the least hazardous course, where both are
> considered safe and appropriate. For this reason, it cannot be held, as a
> matter of law, in all cases where a servant is injured while pursuing a
> method voluntarily adopted by him, more hazardous than other available
> methods, he is guilty of contributory negligence . . . .

*Id.* (quoting *Florida Cent. & P.R. Co. v. Mooney*, 40 Fla. 17, 32 (1898)).

Here, Mr. Bolin's conscious decision to proceed with the fracking operation

despite the absence of a pop-off valve or more substantive high pressure relief valve,

without more, does not establish contributory negligence as a matter of law. That Mr.

Bolin proceeded in the absence of such safety equipment knowing it was "less safe" and a

"calculated risk" does not necessarily mean that Mr. Bolin was contributorily negligent.

Mr. Bolin unequivocally testified that even in the absence of a pop-off valve and high

pressure relief valve, he did not anticipate "a severe over pressurization that will actually

blow the iron up" at the moment the accident occurred, which is the precise moment at

which Alabama law requires this court to evaluate Mr. Bolin's conduct. (*See* doc. 141-1

at 370-71.)  Viewing the evidence in a light most favorable to the Bolins, the court concludes that a jury could reasonably find that Mr. Bolin was not contributorily negligent in proceeding without a pop-off valve or high pressure relief valve.

In support of its second argument, GeoMet relies on Mr. Tate's testimony that Mr. Bolin "should not have been in the danger zone at the time of the accident."  (*See* doc. 130, Ex. S at 98-99.)  GeoMet also contends "that during the priming procedure, Plaintiff personally closed the bleed off valve."  (Doc. 130 at 4.)  To counter this argument, the Bolins rely on the testimony of Mr. Srock, who stated that if the accident happened the way Mr. Bolin said it did, then Mr. Bolin "would have had to stand" in the danger zone. (Doc. 143-1 at 129.)  Mr. Bolin testified that he did not think an accidental over pressurization situation would occur at the time of the accident because he was finished with the prime up process.  (Doc. 141-1 at 368-70.)  Mr. Bolin also testified that he had completed the prime up process before he closed the bleed off valve.  (*See* doc. 140-2 at 227-29.)  There is also evidence of a possible "inadvertent pressure release from one of the trucks through some malfunction of the componetry of the truck." (Doc. 141-1 at 371.)  Prior to the accident, Mr. Magee's truck had problems priming up. (Doc. 140-2 at 235; doc. 141-1 at 272-73.)  Mr. Magee's truck "had lost fluid prime before" and was designated "the last and final truck" that Mr. Bolin brought on.  (Doc. 140-2 at 228; doc. 141-1 at 272-76.)  The problems with Mr. Magee's truck are corroborated by the post-accident handwritten statement of Mr. Tate.  (*See* doc. 148-2.)

As to GeoMet's second argument, the court finds that there are two sides to the story.  A careful review of the evidence before the court reveals that whether Mr. Bolin was contributorily negligent is not an issue upon which all reasonable minds must reach the same conclusion.  The question of whether the over pressurization resulted from the closing of the bleed off valves or resulted from some other human error, such as the malfunction of the truck driven by Mr. Magee, is a genuine issue of material fact that is best suited for resolution by a jury.  Therefore, summary judgment is inappropriate as to GeoMet's affirmative defense of contributory negligence.

## C. ASSUMPTION OF THE RISK

Assumption of risk is an affirmative defense which requires a showing that Plaintiff: (1) knew of and appreciated the danger he incurred, and (2) voluntarily consented to bear that risk.  *Kelton v. Gulf States Steel, Inc.*, 575 So. 2d 1054, 1055 (Ala. 1991)("The affirmative defense of assumption of risk is narrowly confined and is restricted by two requirements: 1) knowledge and appreciation by the plaintiff of the danger he is incurring; and 2) voluntary consent to bear that risk.") (citations omitted).  It is true, as GeoMet notes, that assumption of the risk is a complete defense.  *See Ex parte Barran,* 730 So. 2d 203, 206 (Ala. 1998).  However, the question of whether a plaintiff assumed the risk is one steeped in factual issues.  Consequently, it is typically improper to decide assumption of risk on summary judgment, and it is often left for the jury.  *See Breeden v. Hardy Corp.,* 562 So. 2d 159, 161 (Ala. 1990); *Bogue v. R & M Grocery,* 553

So. 2d 545, 547 (Ala. 1989).

In *Horn v. Fadal Machining Centers, LLC*, 972 So. 2d 63 (Ala. 2007), the

Alabama Supreme Court discussed the knowledge and awareness requirements for

assumption of the risk.  The *Horn* court stated:

> In order to establish assumption of the risk as a matter of law, the evidence must show that *the plaintiff discovered* the alleged defect, was aware of the danger, proceeded unreasonably to use the product, and was injured." *Sears v. Waste Processing Equip., Inc.,* 695 So. 2d 51, 53 (Ala. Civ. App. 1997) (emphasis added). " '[T]he *plaintiff's state of mind* is determined by [a] *subjective* standard,' " not the *objective* standard of reasonableness. *H.R.H. Metals, Inc. v. Miller,* 833 So. 2d 18, 27 (Ala. 2002) (emphasis added) (quoting *McIsaac v. Monte Carlo Club, Inc.,* 587 So. 2d 320, 324 (Ala. 1991)). "Assumption of the risk proceeds from the injured person's actual awareness of the risk." 587 So. 2d at 324. "The plaintiff must know that a risk is present and must understand its nature. *Id.*

*Id.* at 75.

The facts GeoMet relies on to establish contributory negligence are generally the

same as those for contributory negligence and are set forth above.  (*See* Part III.B.)

Taking those facts in a light most favorable to the Bolins, the court finds that triable

issues exist as to whether Mr. Bolin subjectively knew and appreciated the risk of danger.

(*See* doc. 141-1 at 370-71.)  Even assuming, *arguendo*, that it is undisputed that Mr. Bolin

knew of and appreciated the risk of priming up the pumps without a pop-off valve and

high pressure relief valve in place, GeoMet has not shown that the alleged assumption

here was voluntary.  The Supreme Court of Alabama has set out parameters for when the

doctrine of assumption of risk applies:

> The doctrine . . . can apply only where a person may reasonably elect whether or not he shall expose himself to a particular danger; and it has no application where a continued exposure to risk is due to a lack of reasonable opportunity to escape after the danger is appreciated, or is the result of influence, circumstances, or surroundings which are a real inducement to continue.

*Kemp v. Jackson,* 145 So. 2d 187, 194 (1962) (citation omitted).  Whether the circumstances of the case *sub judice* were a "real inducement to continue" working is a factual question.  *Id.*  Mr. Bolin testified that he requested safety devices and relief valves from Superior personnel, but his requests went unanswered.  (Doc. 140-2 at 190-96 & 203-05; doc. 141-1 at 372-373.); *see Skipper v. Shannon, Strobel & Weaver, Inc.*, 623 So. 2d 1072, 1074 (Ala. 1993)(finding evidence that a person complained about a hazard relevant to voluntariness in assessing assumption of the risk).  Mr. Bolin did not believe it was "practical" to stop the job just because the operation did not have something he wanted on it.  (Doc. 141-1 at 373-74.)  He believed it was "more practical to try to do the best you can with what you've got."  (*Id.* at 374.)  There is also evidence that whether to employ a pop-off valve or high pressure relief valve was a decision left to GeoMet.  (*See* Doc. 145-2 at 40; doc. 143-1 at 40; doc. 148-4 ¶¶ 9-13.)  Taking these facts and the evidence in a light most favorable to the Bolins (as the court must), whether Mr. Bolin subjectively knew of and appreciated the risk or voluntarily assumed the risk are questions best left for the trier of fact.  Therefore, summary judgment is inappropriate as to GeoMet's affirmative defense of assumption of the risk.

## CONCLUSION

For the foregoing reasons, GeoMet's Motion for Summary Judgment, (doc. 129), and Motion to Preclude Testimony of Plaintiffs' Expert Herbert Cryar, (doc. 171), are due to be denied.  An Order in conformity with this Memorandum Opinion will be entered contemporaneously herewith.

**DONE**, this 17th day of May, 2011.


_Sharon Lovelace Blackburn_
SHARON  LOVELACE  BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE